# In the United States District Court
# for the Southern District of Georgia
# Savannah Division

```
UNITED STATES OF AMERICA        )
                                )
        v.                      )
                                )   CR 488-032
JAMES GADDY,                    )
                                )
        Defendant.              )
```

## ORDER

Before the Court is Defendant James Gaddy's motion for compassionate release, dkt. no. 226, which the Government opposes, dkt. nos. 230, 233. The motion has been thoroughly briefed, dkt. nos. 226, 230, 232, 233, 234, 235, 239, 242, 251, and the parties have engaged in an evidentiary hearing before the Court, dkt. no. 252. The motion is thus ripe for review.

## FACTUAL BACKGROUND

The crime of conviction is horrendous. That matters greatly, so it is important that we start there. The crime of conviction is not, however, the only factor to consider, so we do not end there.

In February 1988, Gaddy (then age 48) and co-defendant William Danner kidnapped an individual named Alex Sparks at a bowling alley in Nashville, Tennessee. Gaddy pretended that he fell into a ravine and was injured outside the bowling alley,

and when Sparks drove up to the establishment, Danner asked for his assistance in getting Gaddy out of the ravine. When Sparks gave assistance, Danner pulled a stolen gun on Sparks. Danner and Gaddy stole Sparks's car, forcing Sparks to accompany them at gunpoint. Sparks was drugged with Danner's manic-depression medication during the drive to Savannah, Georgia, during which Gaddy and Danner used Sparks's credit cards to purchase gasoline. Upon arriving in Savannah, Gaddy and Danner drove across the river into South Carolina, carried the still-drugged Sparks into a wooded area, and shot him in the head, killing him. Sparks's body was left in the woods.

Gaddy was apprehended in Savannah about one month later, driving Sparks's vehicle, the license plate of which had been switched with one stolen from another vehicle. Co-defendant Danner was arrested around the same time and voluntarily confessed to kidnapping Sparks. Danner also led police to Sparks's body in South Carolina. Gaddy went to trial, and a jury found him guilty on all counts of the redacted indictment: kidnapping (Count 1), interstate transportation of a stolen motor vehicle (Count 2), sale and receipt of a stolen motor vehicle (Count 3), possession of a stolen weapon (Count 4), and fraud (Count 5).[1]

---

[1] The original indictment also charged Gaddy with possession of a weapon by a convicted felon. The Court severed that charge for

## PROCEDURAL BACKGROUND

On March 9, 1989, Gaddy was sentenced by the late B. Avant Edenfield, U.S. District Judge, to life as to Count 1; five years' custody as to each of Counts 2 through 4; and ten years' custody as to Count 5, all to be served concurrently. Gaddy's applicable guideline range was 235 to 293 months, and Judge Edenfield upwardly departed to life. In the event of Gaddy's release from prison, the Court imposed three years of supervised release as to each of Counts 1 through 5, to run concurrently, under standard conditions of supervision. Dkt. No. 125 at 9.

Gaddy filed a direct appeal, and the Eleventh Circuit Court of Appeals affirmed his conviction and sentence on February 20, 1990. United States v. Gaddy, 894 F.2d 1307, 1310 (11th Cir. 1990). Thereafter, Gaddy made multiple attempts to reopen his case, attack his sentence, or reduce his term of imprisonment. In January 2015, Gaddy filed a motion to vacate his sentence, pursuant to 28 U.S.C. § 2255. Dkt. No. 144. The motion was dismissed as untimely. Dkt. Nos. 145, 151, 152. In January 2019, Gaddy filed a motion for compassionate release; he amended that motion in September 2019. Dkt. Nos. 166, 181. The Bureau of Prisons recognized at that time that Gaddy met the threshold criteria for compassionate release under the "elderly inmate"

---

a later trial but ultimately dismissed it following Gaddy's conviction and sentence.

subsection.    Dkt.  No.  181-2.    The  Bureau  of  Prisons  denied
Gaddy's  reduction-in-sentence  request,  however,  "due  to  the
nature  and  circumstances  of  [his]  offense."    Id.    The  Court
similarly  denied  Gaddy's  motion  for  compassionate  release.    Dkt.
No.  190.    In  July  2020,  Gaddy  moved  for  compassionate  release
again,  this  time  basing  his  motion  on  his  medical  issues  and  the
risks  associated  with  COVID.    Dkt.  No.  200.    The  Court  denied
the  motion,  citing  Gaddy's  prior  convictions  and  the  risk  he
posed  to  the  community.    Dkt.  No.  207.    Gaddy  appealed,  dkt.  no.
208,  and  the  Eleventh  Circuit  Court  of  Appeals  affirmed  the
Court's  decision,  dkt.  no.  218.    An  older  and  sicker  Gaddy  has
now  filed  a  third  motion  for  compassionate  release,  pursuant  to
18  U.S.C.  §  3582(c)(1)(A).    Dkt.  No.  226.

## LEGAL AUTHORITY

As  amended  by  the  First  Step  Act  of  2018,  18  U.S.C.
§  3582(c)(1)(A)  provides,  in  relevant  part:

(c)  Modification  of  an  imposed  term  of  imprisonment.
The  court  may  not  modify  a  term  of  imprisonment
once  it  has  been  imposed  except  that—

(1)  In  any  case—

(A) the  court,  upon  motion  of  the  Director  of
the  Bureau  of  Prisons,  or  upon  motion  of
the  defendant  after  the  defendant  has  fully
exhausted  all  administrative  rights  to
appeal  a  failure  of  the  Bureau  of  Prisons
to  bring  a  motion  on  the  defendant's  behalf
or  the  lapse  of  30  days  from  the  receipt  of
such  a  request  by  the  warden  of  the
defendant's  facility,  whichever  is  earlier,

may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

Further, 28 U.S.C. § 994(t) provides that the United States Sentencing Commission, "in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." The

policy statement appears at U.S.S.G. § 1B1.13 and is binding on the Court. <u>United States v. Bryant</u>, 996 F.3d 1243, 1262 (11th Cir. 2021) ("In short, we hold that 1B1.13 is an applicable policy statement that governs all motions under Section 3582(c)(1)(A). Accordingly, district courts may not reduce a sentence under Section 3582(c)(1)(A) unless a reduction would be consistent with 1B1.13.").

U.S.S.G § 1B1.13 provides:

Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that . . .

Extraordinary and compelling reasons warrant the reduction . . . .

§ 1B1.13(a)-(a)(1)(A). The Commission identifies six categories of "extraordinary and compelling reasons": (1) medical circumstances of the defendant; (2) age of the defendant; (3) family circumstances of the defendant; (4) victim of abuse; (5) other reasons; and (6) an unusually long sentence. § 1B1.13(b)(1)-(6). Thus, a district court cannot grant a § 3582(c)(1)(A) reduction unless the defendant meets three conditions: "first, that an extraordinary and compelling reason exists; second, that a sentencing reduction would be consistent

with U.S.S.G. § 1B1.13 [including that the defendant is not a danger to the safety of any other person or to the community]; and third, that § 3553(a) factors weigh in favor of compassionate release." United States v. Giron, 15 F.4th 1343, 1347 (11th Cir. 2021) (alteration added). A district court may analyze these three conditions in any order. Id. In general, a defendant has the burden to show circumstances meeting all the requirements. United States v. Granda, 852 F. App'x 442, 446 (11th Cir. 2021) (noting that it was defendant's "burden to show that his circumstances warranted a reduction").

## DISCUSSION

### I.  Extraordinary and Compelling Reason

Gaddy argues he qualifies for compassionate release based on the "age," "medical condition," and "other reasons" categories of extraordinary and compelling reasons. Dkt. No. 226 at 11 (citing § 1B1.13(b)(1), (b)(2), (b)(5)). The Court begins its analysis with Gaddy's age.

For Gaddy to qualify for a sentence reduction under this category, he must (A) be sixty-five years old, (B) be "experiencing a serious deterioration in physical or mental health because of the aging process," and (C) have "served at least 10 years or 75 percent of his . . . term of imprisonment, whichever is less." § 1B1.13(b)(2). As of the date of this Order, Gaddy is eighty-five years old, and he has served just

shy of thirty-seven years in prison. Therefore, he easily satisfies factors (A) and (C). The Government disputes, however, that Gaddy satisfies factor (B).

To assess the status of Gaddy's physical and mental health, the Court reviews Gaddy's voluminous medical records and Gaddy's declaration, as well as the assessments of Gaddy's treating physician, Dr. Patrick Craft, and non-treating physicians, Dr. Robert Hiensch and Dr. Laura Mosqueda, all of whom testified at the evidentiary hearing on February 7, 2025. Dkt. Nos. 226-4, 226-5, 226-6, 226-7, 226-12, 239, 242, 251.

### A. Gaddy's Declaration

In his declaration, Gaddy states he has "cramps, spasms, and pain in [his] hips, knees, back, feet, and a severe problem with [his] swollen prostate." Dkt. No. 226-6 at 2. Gaddy "struggle[s] with incontinence, neuropathy, and require[s] a walker for any movement around [his] unit or to go to any facility on the compound." Id. He contends his prescribed pain medication is "grossly insufficient." Id. Gaddy says his "hearing and eyesight have significantly deteriorated," which make it "difficult to function." Id. He says that, as a result of a "severe" case of COVID in August 2022, he "suffer[s] lasting effects, including trouble with [] breathing" and "cannot even walk a few feet without gasping or having to stop due to pains from shortness of breath." Id. at 2-3. Gaddy

states that, "[u]ntil recently, [he] was entirely dependent on supplemental oxygen." Id. at 3. Gaddy says, sometime after January 2023, he "suffered from a fall, resulting in bruising and scabbing." Id. Gaddy states his health is getting worse with each passing day. Id. at 2.

### B. Dr. Robert Hiensch

Dr. Robert Hiensch served as a medical expert for Gaddy. Dkt. No. 226-5 at 2. Dr. Hiensch is a board-certified physician specializing in Internal Medicine, Pulmonary Medicine, Critical Care Medicine, and Sleep Medicine. Id. Dr. Hiensch did not conduct a physical exam of Gaddy, but he reviewed over 250 pages of Gaddy's medical records. Id. The following facts and/or opinions are taken from Dr. Hiensch's declaration and hearing testimony.

"Mr. Gaddy is an 84-year-old man with a past medical history notable for chronic obstructive pulmonary disease [(COPD)], coronary artery disease [(CAD)], chronic kidney disease, cataracts, peripheral neuropathy, borderline type 2 diabetes mellitus, obesity, hypothyroidism, gastroesophageal reflux disease, hypertension, and hyperlipidemia." Id. at 3. "In August 2022, Mr. Gaddy developed severe Covid-19, which was complicated by superimposed bacterial pneumonia." Id. "The resulting injury to his lungs worsened his already diseased lungs and left him unable to maintain normal oxygen saturations

with exertion." Id. Gaddy "takes over ten medications and
inhalers on a daily basis." Id. "Mr. Gaddy's diseased and
injured lung conditions are unlikely to improve significantly
and carry a poor prognosis with respect to his life expectancy."
Id. Mr. Gaddy also has COPD. Id. "Features common to COPD
include reduced lung function, difficulty breathing, and
increasing susceptibility to respiratory infections, such as
Covid-19 and pneumonia." Id. "COPD usually shortens life
expectancy and . . . is also linked to a number of comorbid
conditions, such as lung cancer, cardiovascular disease, and
cognitive dysfunction that may develop in the future." Id.
Gaddy also suffers from CAD, "a condition in which the blood
vessels that carry blood to the heart become clogged with fatty
deposits." Id. "[S]ymptoms of CAD include chest pain,
shortness of breath, and feeling dizzy and lightheaded,
particularly with exertion." Id. "Having CAD puts [one] at
risk for having a heart attack, sudden death, and cardiac
arrhythmias." Id. "Mr. Gaddy was previously treated for his
CAD with a stent in the left anterior descending artery." Id.
"Mr. Gaddy has limited mobility due to his age and multitude of
medical problems." Id. at 4. "He also requires the use of a
wheeled rolling walker when taking more than a few steps and
suffers from cataracts which impair his vision." Id.
"Consequently, Mr. Gaddy is at a high risk of serious injury due

to falling," which "could likely result in significant injury such as a hip fracture or head injury." Id. Mr. Gaddy is "at high risk of accelerated cognitive decline." Id. Dr. Hiensch opines that "Mr. Gaddy has permanent and debilitating illnesses that cause significant disability in his daily life," and Gaddy's "multiple, irreversible medical conditions . . . severely limit his life expectancy." Id.

At the evidentiary hearing, Dr. Hiensch testified that a typical eighty-five year-old has a life expectancy of five years or less. In October 2023, Dr. Hiensch opined that, when Gaddy's "medical comorbidities are included, his remaining life expectancy is much shorter, likely less than three years." Id.

### C. Dr. Laura Mosqueda

Dr. Laura Mosqueda also served as a medical expert for Gaddy. Dkt. No. 226-7. Dr. Mosqueda is a board-certified family physician and geriatrician. Id. at 2. Dr. Mosqueda did not conduct a physical examination of Gaddy, but she did review his medical records. Id. The following facts and/or opinions are taken from Dr. Mosqueda's declaration and hearing testimony.

"Mr. Gaddy has multiple medical problems that demonstrate age-related deterioration of health and that make him at high risk of serious physical injury and accelerated cognitive decline." Id. at 3. "These problems include poor vision, poor hearing, and severe joint pain in his hips, knees, back, and

11

feet." Id. "According to the medical records, Mr. Gaddy has coronary artery disease, chronic obstructive pulmonary disease, hyperlipidemia, chronic pain, urinary incontinence, peripheral neuropathy, presbycusis, cataracts, hypertension, hypothyroidism, benign prostatic hypertrophy, intermittent claudication, [gastroesophageal reflux disease], prediabetes, and is edentulous." Id. "Mr. Gaddy uses or has used several items of durable medical equipment," including "dentures, oxygen concentrator, portable oxygen, medical shoes, prescription glasses, knee high compression stockings, a double mattress, and a rolling seated walker." Id. "In the last several years, Mr. Gaddy experienced a significant decline in his physical and mental health which will likely continue to progress and even accelerate in view of his current age and health status." Id. "Mr. Gaddy is at a high risk of falling due to his age, vision impairment, hearing loss, chronic joint pain, inadequate pain control, and the living conditions of incarceration." Id. "Mr. Gaddy is also at high risk for developing a dementing illness such as Alzheimer's due to a combination of his medical conditions (e.g. hypertension, prediabetes, hyperlipidemia), limited sensory input (severe vision loss and hearing loss), poor sleep, and his current age." Id. "Because of vision and hearing loss, Mr. Gaddy has difficulty communicating, reading, and engaging in daily activities." Id. "Mr. Gaddy requires a

walker for movement, including around his unit, and is experiencing increased difficulty with walking to parts of the prison . . . due to his poor eyesight and hearing and chronic pain." Id. "Mr. Gaddy also reports that he is getting confused at times as a result of his poor hearing and limited vision." Id. "In addition, Mr. Gaddy's sleep is very poor and he gets up multiple times each night to urinate. Sleep problems exacerbate [his] risk of falling and confusion." Id. Dr. Mosqueda opines that Gaddy's "ability to function and fulfill his daily needs has substantially decreased as a result of his aging and medical conditions." Id. "He is at high risk of permanent vision and hearing loss, serious injury from a fall or accident, and accelerated cognitive decline." Id.

### D. Dr. Patrick Craft

Dr. Patrick Craft served as a medical expert for the Government. Dr. Craft has been Gaddy's treating physician at his current Bureau of Prisons' facility since Gaddy's transfer there in December 2022.[2] See generally Dkt. No. 242. In his declaration, Dr. Craft identifies Gaddy's "significant medical dates." Id. at 1. The following facts and/or opinions are taken from Dr. Craft's declaration.

---

[2] After his bout with COVID in August 2022, Gaddy was hospitalized and "discharged on oxygen." Dkt. No. 242 at 1. As a result, he became characterized as a "Care Level 3." Id. This necessitated his transfer to his current facility, which is equipped to care for Care Level 3 inmates. See id.

12/16/2022 Seen for an initial physical. History reviewed. In 2006 he had 1 vessel coronary bypass at Savannah Medical Center. He had a normal cardiac stress test in 2020. His other diagnosis are Stomach acid reflux, low thyroid, symptomatic enlarge prostate, history of smoking, history heavy alcohol use.

1/24/2023 Seen by me to discuss oxygen use. Was not using his oxygen and blood oxygen normal so oxygen stopped.

6/7/2023 Refused chronic care appointment. The chronic care appointment is the yearly (to more frequent) appt with a Physician to review care of chronic medical problems.

11/17/2023- sick call appt

11/14/2024 during chronic care appt Gaddy became angry and appt terminated.

5/8/2024 Gaddy presented to sick call with abdominal pain. He was transferred to local hospital, nothing acute noted and transferred back to BTF after inpatient stay.

7/9/2024 left eye cataract surgery.

10/23/2024 chronic care appt with Dr Keats.

1/10/2025- I saw in the unit.

Currently Gaddy is functioning independently[.]

[Gaddy] is at risk of falling, dementia, hearing loss, vision loss, sudden cardiac death but these risks are not confined to the correctional environment.

[Gaddy's] life in prison is more stable, he has a support network and likely better medical outcome than if he were alone . . . without significant family or friends.

Id. at 1-2. At the evidentiary hearing, Dr. Craft remarked that Gaddy has no difficulties in his activities of daily living.

14

Dr. Craft also stated that Gaddy recovered well from COVID and suffered no permanent damage as a result. Dr. Craft remarked that Gaddy "may" have emphysema (COPD) but that no pulmonary function studies are available because Gaddy had other issues that were more pressing. Dr. Craft contends Gaddy shows no signs of dementia and his deterioration of mental health is normal. When asked at the evidentiary hearing about Gaddy having reported ten urinary tract infections within one year, see dkt. no. 226-4 at 37, Dr. Craft stated, "Patients can say anything to you." Dr. Craft was unable to answer a significant number of questions posed to him at the hearing regarding Gaddy's health, which could be due to his caseload of 750 to 800 inmate patients. The Court was left with the impression that Dr. Craft was doing the best he could do under difficult circumstances and time constraints that left him unable to focus on Mr. Gaddy at length.

### E. Gaddy's Medical Records

Gaddy's medical records show that he suffers from several serious medical conditions. In August 2022, Gaddy developed a severe case of COVID along with "superimposed bacterial pneumonia," resulting in Gaddy's hospitalization for seven weeks, much of it in intensive care. Dkt. No. 226-4 at 6, 42, 77-87. At that time, Gaddy was on fifteen different medications. Id. at 87. In August 2023, Gaddy presented to

15

Rehabilitation Services with a "shuffled gait." Id. at 42. The provider noted he "still gets short of breath with longer distance walking" and "would benefit from use of a rollator to prevent falls and allow for rest on long compound moves." Id.

Gaddy suffers from coronary artery disease. Id. at 3. In 2006, he received a stent in his left anterior descending artery. Id. at 6. As of November 2022, Gaddy had age-related nuclear cataract of both eyes; surgery was recommended for his left eye. Id. at 2, 23-27. He also has posterior vitreous detachment of the left eye. Id. at 24, 27. In April 2024, he had 20/100 visual acuity in his right eye and 20/200 in his left eye. Id. at 25. Gaddy also suffers from idiopathic peripheral neuropathy with "stabbing like quality" in his feet, for which he was prescribed medical shoes, compression socks and a lower bunk. Id. at 2, 7, 40, 41, 43, 45-47. Gaddy's other ailments include abdominal pain, incontinence, hypertrophy (swelling) of the prostate, frequent urinary tract infections, and diabetes mellitus. Id. at 2-3, 37.

### F. Age of the Defendant

"Extraordinary and compelling reasons" warranting a sentence reduction exist when "[t]he defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of

imprisonment, whichever is less."  As noted *supra*, the parties do not dispute that Gaddy meets factors (A) and (C).  After consideration of the medical evidence, the Court concludes that Gaddy also meets factor (B).

There is no doubt that Gaddy is experiencing a serious deterioration of his physical health due to aging.  He is eighty-five years old, and his vision, hearing, breathing, and mobility are compromised.  While the Government points out that Gaddy's medical issues are being addressed at his facility—such as having cataract surgery on one eye in July 2024—the record evidence shows that Gaddy's physical health has declined significantly since his most recent motion for compassionate release filed in 2020.  Dkt. No. 230 at 9; see also Dkt. No. 200.  The Government also points out that Gaddy discontinued using supplemental oxygen in August 2023.  Dkt. No. 230 at 10; see also Dkt. No. 251-1.  However, the Government does not contradict Gaddy's contention, supported by medical records, that he can walk only short distances without experiencing shortness of breath or taking a break.  The Government also offers no evidence to impugn Dr. Hiensch's expert opinion that Gaddy "has permanent and debilitating illnesses that cause significant disability in his daily life," dkt. no. 226-5 at 4, or Dr. Mosqueda's expert opinion that Gaddy "has multiple medical problems that demonstrate age-related deterioration of

17

health and that make him at high risk of serious physical injury and accelerated cognitive decline," dkt. no. 226-7 at 3. Dr. Craft's testimony that Gaddy experiences no difficulties with activities of daily living is unpersuasive.

Accordingly, the evidence shows that Gaddy is experiencing a serious deterioration of his physical health due to aging. He has therefore satisfied all factors required under § 1B1.13(b)(2) ("Age of the Defendant") and shown an extraordinary and compelling reason warranting a sentence reduction.[3]

## II.  18 U.S.C. § 3553(a) Factors

A district court cannot grant a § 3582(c)(1)(A) reduction unless the defendant meets three conditions: "first, that an extraordinary and compelling reason exists; second, that a sentencing reduction would be consistent with U.S.S.G. § 1B1.13 [including that the defendant is not a danger to the safety of any other person or to the community]; and third, that § 3553(a) factors weigh in favor of compassionate release." Giron, 15 F.4th at 1347. A district court may analyze these three conditions in any order. Id. Having found that Gaddy meets the

---

[3] Because the Court has found an extraordinary and compelling reason exists under § 1B1.13(b)(2), the Court need not address Gaddy's contention that he also qualifies for a sentence reduction under § 1B1.13(b)(1) or § 1B1.13(b)(5).

first condition, the Court now turns to the § 3553(a) factors.
Those factors are:

> (1)  the nature and circumstances of the offense and
>      the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed—
>
>      (A)  to reflect the seriousness of the offense,
>           to promote respect for the law, and to
>           provide just punishment for the offense;
>
>      (B)  to afford adequate deterrence to criminal
>           conduct;
>
>      (C)  to protect the public from further crimes of
>           the defendant; and
>
>      (D)  to provide the defendant with needed
>           educational or vocational training, medical
>           care, or other correctional treatment in the
>           most effective manner;
>
> (3)  the kinds of sentences available;
>
> (4)  the kinds of sentence and the sentencing range
>      established . . . .
>
> (5)  any pertinent policy statement . . . .
>
> (6)  the need to avoid unwarranted sentence
>      disparities among defendants with similar records
>      who have been found guilty of similar conduct;
>      and
>
> (7)  the need to provide restitution to any victims of
>      the offense.

At the evidentiary hearing, the Court asked the parties
which § 3553(a) factors were relevant to Gaddy's motion.  The
parties agreed that factors (3) and (7) were not relevant, so
the Court discusses the remaining factors.

19

### A. § 3553(a)(1)

#### i. Nature and Circumstances of the Offense

The kidnapping and ultimate murder of Alex Sparks was heinous and violent.  Gaddy does not dispute—nor could he—that his offense was of the worst kind.

#### ii. History and Characteristics of Defendant

##### a. Pre-Offense[4]

Gaddy's criminal history is terrible, too.  At sixteen years old, Gaddy dropped out of high school and joined the Air Force.  He was honorably discharged in June of 1956.  Dkt. No. 226-1.  Gaddy struggled with alcoholism throughout his adolescence and young adulthood.  In 1959, Gaddy was convicted of interstate transportation of a stolen motor vehicle in Ohio at age nineteen.  He was sentenced to three years in custody but was paroled in April 1960 only to violate parole later that year when he was convicted of bank robbery at age twenty.  He was sentenced to ten years in custody for that offense but was paroled in December 1964.  At that point, Gaddy became a licensed aviation mechanic.  He started his own business training others in this field, primarily training soldiers at the Hunter Army Airfield.  The airfield was eventually

---

[4] The facts contained in this section are reflected in Gaddy's presentence investigation report.

deactivated, however, and in 1979, Gaddy was forced to close his business.  As a result, Gaddy relapsed into alcoholism.

In November of 1979, at age forty, Gaddy robbed a bank by use of a firearm and escaped with over $16,000.  He was arrested later that day after being stopped for speeding and driving while intoxicated.  A search of his vehicle revealed the stolen money and a .44 magnum pistol.  While in custody, an investigation revealed Gaddy was involved in three armed robberies of convenience stores.  Gaddy went to trial on the bank robbery (charges of armed robbery and possession of a firearm by a convicted felon), and a jury found him guilty.  He was sentenced to forty years in custody with three years' minimum to serve.  He entered a plea of guilty to one of the convenience store robberies and received a sentence that ran concurrently with the bank robbery sentence.  He was paroled in September 1984.  In September 1986, at age forty-seven, Gaddy was charged with DUI, and his license was suspended.  In September 1987, a parole violator's warrant was issued charging Gaddy with absconding supervision, failure to report and violation of law for the DUI.  After he committed the offense in this case in early 1988, he was arrested pursuant to the parole violator's warrant.

### b. Post-Offense

Gaddy's post-conviction record tells a different story. While incarcerated for nearly thirty-seven years, Gaddy has committed no disciplinary infractions. Dkt. No. 226-3 at 4. Additionally, Gaddy has a tremendous record throughout his approximately thirty years of employment with UNICOR. Dkt. No. 226-3 at 8-9; Dkt. No. 226-8. Gaddy was described as "indispensable" by the factory manager and praised for his efforts and willingness to help others. Dkt. No. 226-8 at 2 ("His work ethics remain top notch, and his interaction with staff and inmates alike is exemplary"); see also id. at 4 ("Gaddy has shown an above average work ethic, a good attitude towards his job, other inmates, and his supervisors. [He] is an outstanding worker who takes pride in his assigned duties, and is known to do extra work when called upon to fill a necessary need."); id. at 7 (Gaddy "has demonstrated his skill, experience and selfless dedication in a manner which exceeds his obligations as an employee and establishes him as a valuable asset to UNICOR.").

Gaddy has also used his time in prison to mentor younger inmates. See Dkt. No. 226-9 at 5 (letter from former inmate who "observed [Gaddy] mentoring" younger inmates and "advis[ing] them to stay away from the prison gangs"); Dkt. No. 202 at 1 (letter from former inmate stating: "I looked up to Mr. Gaddy as

22

a parental figure"; Gaddy "is a great man to go to if you need advice"; "I could search the whole prison system and not have one person that could say anything negative about this man"). Gaddy's conduct while in custody is that of a model inmate.

### B. § 3553(a)(2) — The need for the sentence to:

#### i. Reflect seriousness of offense, promote respect for the law, and provide just punishment

The seriousness of Gaddy's offense cannot be overstated. Indeed, Gaddy "accept[s] [his] punishment as being what [he] deserved." Dkt. No. 166 at 2. Gaddy has been imprisoned for nearly thirty-seven years, over forty percent of his lifetime. Such a sentence reflects the seriousness of his offense and punishes him for his abhorrent actions. Gaddy's lack of a disciplinary record while in prison reflects, perhaps, a newfound respect for authority and the law. Gaddy's sentence appears to have accomplished what society hopes it will—punishment and rehabilitation.

#### ii. Afford Adequate Deterrence

Gaddy's time in prison, to date, is significant. A sentence reduction at this juncture would not lessen the deterrence of others from committing a similar offense. Imagine a person deciding whether or not to commit Gaddy's crimes. Surely, no one would be swayed to proceed because he "only" runs

the risk of serving thirty-seven years in federal prison with release possible at the age of eighty-five.

### iii. Protect the Public

This important factor gives the Court pause. While the risk of recidivism is never a nullity, in Gaddy's case it appears unlikely that he will reoffend. Not only is he advanced in age, his physical health has deteriorated such that he cannot walk long distances without becoming short of breath. Further, Gaddy has had no disciplinary incidents during his incarceration, which tends to show he will obey the law and abide by any conditions imposed upon him if released.

Indeed, the Bureau of Prisons has deemed Gaddy a low recidivism risk level. Dkt. No. 226-3 at 5, 6. The recidivism-risk determination was made with the Bureau of Prisons' own risk assessment tool, Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN"). Id. at 5; see also Sharma v. Peters, No. 2:24-CV-158-RAH-KFP, 2024 WL 4668135, at *3 (M.D. Ala. Nov. 4, 2024). PATTERN takes into consideration many factors, including the individual's offense conduct, criminal history, and history of violence. Dkt. No. 226-3 at 5. A 2021 National Institute of Justice study found that PATTERN has a "high level of predictive accuracy." Nat'l Inst. Of Justice, 2021 Review and Revalidation of the First Step Act Risk Assessment Tool (Dec. 2021), at 3, 43, available at https://www.ojp.gov/

pdffiles1/nij/303859.pdf ("Results suggest PATTERN 1.3 displays a high level of predictive accuracy, with [Area Under the Curves] ranging from 0.75 to 0.79 across validation and revalidation samples.").

Further, "[s]tatistics show that age exerts a powerful influence on the recidivism rate, which declines as offenders get older." United States v. Smith, 482 F. Supp. 3d 1218, 1226 (M.D. Fla. 2020) (citing U.S. Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, at 3, 23 (2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf). "According to the Sentencing Commission, offenders aged 65 and older, like [Gaddy], are the least likely to be rearrested, reincarcerated, or reconvicted." Id. (citing The Effects of Aging at 23).

### iv. Provide Defendant with needed training and medical care

While incarcerated, Gaddy has received various forms of education and training. First, he obtained his G.E.D. Dkt. No. 226-3 at 11. He also completed at least twelve educational courses, including business management and computer programming. Id. Additionally, Gaddy received on-the-job training in several different areas—for example, textiles, business practices, manufacturing control systems, cost analysis, inventory

management and computer software—while working for UNICOR for approximately thirty years. See Dkt. No. 226-8. Gaddy's "unit team has no recommendations" for further training "as there are no deficiencies that need to be addressed." Dkt. No. 239-1 at 4.

As for medical care, the Court's discussion *supra* reflects Gaddy's extensive healthcare needs. The Government contends Gaddy is receiving sufficient care at his facility, which is equipped to handle Care Level 3 and 4 inmates. Dkt. No. 242. On the other hand, Gaddy submits that because of his Veteran status, he is eligible to receive medical care from the Department of Veterans Affairs ("VA"). Dkt. No. 226 at 9. Indeed, Gaddy has submitted a letter from the VA confirming his enrollment in its healthcare system. Dkt. No. 226-10. Additionally, Gaddy's family states they will provide transportation to his medical appointments and assist him with his medical needs and end-of-life care. Dkt. No. 226-9; Dkt. No. 239-1 (Gaddy's "family remains supportive and [will] provide for his modest financial needs.").

### C. § 3553(a)(4) – The Kinds of Sentence and Sentencing Range

At the evidentiary hearing, Gaddy's counsel acknowledged that Gaddy was not challenging the life sentence imposed. However, Defense counsel noted that Gaddy's sentencing guideline

range was 235 to 293 months' imprisonment, and the sentencing
judge upwardly departed to life.  While there appears to be no
official record reflecting the reason for the upward departure,
the presentence investigation report recommended an upward
departure on either of two bases: (1) life imprisonment since
the kidnapping resulted in the victim's death; and (2) Gaddy's
criminal history category did not adequately reflect the
seriousness of his past criminal conduct.  The Court determines
this factor is subsumed by § 3553(a)(1)'s consideration of the
nature and circumstances of the offense and the history and
characteristics of the defendant.  Further, "under § 3582(c)(1),
[the Court's] task [i]s not to assess the correctness of the
original sentence it imposed.  Rather, its task [i]s to
determine whether the § 3553(a) factors counsel[] against a
sentence reduction in light of the new, extraordinary
circumstances identified."  United States v. Kibble, 992 F.3d
326, 334 (4th Cir. 2021) (Gregory, J., concurring).

### D. § 3553(a)(5) – Pertinent Policy Statements

A reduction in sentence must be in line with pertinent
policy statements, here, § 1B1.13.  Gaddy points out that
§ 1B1.13 permits a court to modify an inmate's sentence without
carving out certain types of crimes.  That is, the U.S.
Sentencing Commission permits compassionate release of inmates
regardless of the type of offense they committed—as long as all

27

of the requirements are met.  See 18 U.S.C. § 3582(c)(1)(A) (making compassionate release possible "in any case"); Kibble, 992 F.3d at 334 (Gregory, J., concurring) ("When a statute provides for relief in 'any case,' there is no basis for categorically limiting that relief to a certain subset of cases." (citing United States v. Gonzales, 520 U.S. 1, 5 (1997))).

The policy statement also considers victims.  Application Note 2 of the Commentary provides:  "Before granting a motion pursuant to 18 U.S.C. § 3582(c)(1)(A), the Commission encourages the court to make its best effort to ensure that any victim of the offense is reasonably, accurately, and timely notified, and provided, to the extent practicable, with an opportunity to be reasonably heard, unless any such victim previously requested not to be notified."  The Court took care to ensure Mr. Sparks's family was aware of the motion and the hearing and that the family was afforded an opportunity to be heard.  Dkt. No. 250. A close family member of the victim elected to address the Court by letter.  The victim's family strongly objects to Gaddy's motion for compassionate release.  See Dkt. No. 252 ("This is a very serious matter for me.  Not only did I lose my [family member] and my best friend, it's killing me to go down this road again.  I think [Gaddy] should stay in prison for all his life. And if he is so bad off and if he dies in prison, he should be

28

where he is to serve all of his time." (Evidentiary hearing recording at 04:57:58-04:58:24)).

### E. § 3553(a)(6) – Unwarranted Sentencing Disparities

Gaddy argues a sentence reduction is appropriate to avoid unwarranted sentencing disparities. Dkt. No. 226 at 24-26. Gaddy first points to the U.S. Sentencing Commission's most recent statistics to show that the national average length of a murder sentence is 285 months, while the average length of a murder sentence imposed by courts in the Southern District of Georgia is 393 months. U.S. Sent'g Comm'n, Statistical Info. Packet FY 2023, S. Dist. of Ga., at 13 ("Sentence Length by Type of Crime"), https://www.ussc.gov/sites/default/files/pdf/re search-and-publications/federal-sentencing-statistics/state-dist rict-circuit/2023/gas23.pdf. As of the date of this Order, Gaddy has served approximately 441 months' imprisonment.

Next, Gaddy points to cases in other districts where courts have reduced imprisonment terms of inmates convicted of murder. In United States v. Eder, the defendant was convicted by a jury of second-degree murder and assault resulting in serious bodily injury. No. CR-10-97, 2024 WL 2749395, at *1 (D. Mont. May 29, 2024). As part of the offense, the defendant "stabbed victim R.B. numerous times as he lay in bed, causing his death, and bit off victim D.B.'s lower ear lobe." Id. at *2. The defendant "received a sentence of 365 months of custody, the maximum

29

guideline range for a total offense level of 40 and a criminal history category of 1." Id. at *1. The court ultimately reduced the defendant's sentence to 300 months of custody because the 365-month sentence was a "substantial increase over sentences imposed on similarly situated defendants." Id. at *2 (also noting the defendant's participation in mental health treatment and substantial educational programming). In United States v. Putten, the defendant was found guilty in a trial by jury of the murder of a rival gang member while engaging in a narcotics conspiracy. 726 F. Supp. 3d 245, 248-50 (S.D.N.Y. 2024). He was sentenced to life imprisonment. Id. at 250. The court ultimately reduced the defendant's sentence to thirty years' imprisonment. Id. at 260. The court based its decision on the sentencing court's mistaken "assertion that similarly situated, federal defendants typically receive life sentences." Id. at 252. The court concluded that "the opposite is true" because, "although the data do not necessarily show what sentence is typical for similarly situated murder defendants, they all but prove that a life sentence is not." Id. at 252-54 (citing U.S. Sentencing Commission's statistics).

Finally, Gaddy notes that Danner, his co-defendant, was sentenced to 210 months' imprisonment and was released from custody on November 10, 2005. Dkt. No. 226 at 3, 25. Gaddy has served over twice the time Danner served in prison. The

Government stresses, however, that Danner is not a similarly situated defendant for purposes of § 3553(a)(6). That is, Danner cooperated with law enforcement, he led agents to Sparks's body and testified at Gaddy's trial. Unlike Gaddy, Danner pled guilty and accepted responsibility for his actions. The Government's reasoning is persuasive—at the time of sentencing, Gaddy and Danner were not similarly situated.[5]

## F. The § 3553(a) Factors Weigh in Favor of a Sentence Reduction

The Court concludes that the § 3553(a) factors weigh, ever so slightly, in favor of a sentence reduction. The factor weighing most strongly against Gaddy's release is, of course, the nature and circumstances of the underlying offense—the kidnapping and ultimate murder of Alex Sparks. See § 3553(a)(1). The Court's consideration of the § 3553(a)

---

[5] It is worth noting, however, that since Gaddy's sentencing, he has accepted responsibility for his actions. Dkt. No. 166 at 2 (Gaddy stating, "Up front I accept responsibility for the tragedy and sorrow I caused 31 years ago. I also accept my punishment as being what I deserved"); Dkt. No. 181 at 1 (Gaddy's former co-inmate stating, "Mr. Gaddy deeply regrets he can never restore the life of Alex Sparks"); Dkt. No. 235-1 at 3 (Gaddy's former co-inmate stating that, in his eighteen years in prison, he "did not meet a man who more impressed [him] with the depth of his remorse for his offense(s) . . . than Mr. Gaddy"); Dkt. No. 200 at 7-8 (Gaddy stating, "Remorse and being humble was what got me through those years . . . . It's what prevents one from having an 'attitude'—be it against staff or inmates"); id. at 11 (Gaddy stating, "I have nothing left to offer that in any way could compensate those I have hurt—even if I lived forever. I only hope they will forgive me while I am still alive").

factors in no way minimizes Gaddy's abhorrent actions or the tremendous loss Mr. Sparks's family and friends continue to endure.    Instead, the Court "recognize[s] the breadth of 18 U.S.C. § 3582(c)(1)'s text not to discount the seriousness of some criminal offenses, but to give effect to the policy choice that Congress made plain:  when extraordinary and compelling circumstances exist, even the most serious offenders may be eligible for mercy."  Kibble, 992 F.3d at 334.

> Section 3582(c)(1) necessarily envisions that the § 3553(a) factors may balance differently upon a motion for compassionate release than they did at the initial sentencing. An individual requesting compassionate release will, in all cases, be serving a sentence that a district court once held was "sufficient but not greater than necessary." If a district court's original § 3553(a) analysis could always prove that a sentence reduction would intolerably undermine the § 3553(a) factors, then 18 U.S.C. § 3582(c)(1) would, in effect, be a nullity.

Id. at 335.  The Court is aware that the measure of mercy Gaddy receives today is a measure he forever denied to his victim.    However, Gaddy's nearly thirty-seven-year sentence reflects the seriousness of his offense, promotes respect for the law and provides just punishment for his crimes.  Gaddy's time in prison adequately deters others from such criminal conduct; it has also allowed Gaddy to obtain his G.E.D., complete educational courses and receive on-the-job training.    Finally, evidence from the U.S. Sentencing Commission shows that Gaddy's sentence of life

imprisonment is harsher than sentences imposed on other defendants who committed similar crimes across the nation.

### III. § 1B1.13

The Court has concluded that an extraordinary and compelling reason for compassionate release exists and that the § 3553(a) factors weigh in favor of release. <u>Giron</u>, 15 F.4th at 1347. The Court now assesses the third and final requirement that must be satisfied before the Court may grant compassionate release, that is, a sentencing reduction must be consistent with U.S.S.G. § 1B1.13. <u>Id.</u>

The remaining inquiry under § 1B1.13 is whether Gaddy is a danger to the safety of any other person or to the community. § 1B1.13(2) (referencing 18 U.S.C. § 3142(g)). The Court has covered much of this inquiry with its discussion of the need for a sentence to protect the public from further crimes of the defendant, *supra*. <u>See</u> § 3553(a)(2)(C). As previously determined, the risk that Gaddy will recidivate, while not a nullity, is quite low given his age, physical health, and lack of a disciplinary record while in custody. Additionally, Gaddy has the support of many family members and friends; several have written letters on his behalf, dkt. nos. 226-9, 235-1, and several attended the evidentiary hearing to show their support. <u>See</u> Dkt. No. 252 (Defense counsel pointing out that Gaddy's nephew, Jerry Gaddy, with whom Gaddy would reside, was in

attendance at the evidentiary hearing, as was Gaddy's sister, Patricia Gaddy, and several of Gaddy's former co-inmates who worked for UNICOR at FCI Jesup (Evidentiary hearing recording at 05:05:32-05:06:44)). Additionally, the Court can impose special conditions of supervision to closely monitor Gaddy upon release. The Court therefore finds that Gaddy is no longer a danger to the safety of any other person or to the community, and a sentence reduction would be consistent with § 1B1.13. Gaddy has therefore met all three requirements for compassionate release under § 3582(c)(1)(A), and thus, a reduction in sentence is warranted.

## IV.  Conclusion

The Court concludes that Gaddy has shown 1) an extraordinary and compelling reason warranting compassionate release; 2) a sentence reduction would be consistent with U.S.S.G. § 1B1.13 (including that the defendant is not a danger to the safety of any other person or to the community); and 3) that § 3553(a) factors weigh in favor of compassionate release. Accordingly, Gaddy's motion for compassionate release, dkt. no. 226, is **GRANTED**. Gaddy's previously imposed sentence of life imprisonment is reduced to time served.

Gaddy's previously imposed three-year term of supervised release remains in effect. However, the Court imposes the following standard and special conditions of supervision (in

34

addition to or in conjunction with the conditions imposed at sentencing):

<u>Standard Conditions</u>

(1) The defendant must report to the probation officer in the federal judicial district where he is authorized to reside within 72 hours of his release from imprisonment, unless the probation officer instructs him to report to a different probation office or within a different time frame.

(2) After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when he must report to the probation officer, and he must report to the probation officer as instructed.

(3) The defendant must not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the court or the probation officer.

(4) The defendant must answer truthfully the questions asked by his probation officer.

(5) The defendant must live at a place approved by the probation officer. If the defendant plans to change where he lives or anything about his living arrangements (such as the people he lives with), he

must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, the defendant must notify the probation officer within 72 hours of becoming aware of a change or expected change.

(6) The defendant must allow the probation officer to visit him at any time at his home or elsewhere, and the defendant must permit the probation officer to take any items prohibited by the conditions of defendant's supervision that he or she observes in plain view.

(7) The defendant must not communicate or interact with someone he knows is engaged in criminal activity. If defendant knows someone has been convicted of a felony, he must not knowingly communicate or interact with that person without first getting permission of the probation officer.

(8) If defendant is arrested or questioned by a law enforcement officer, he must notify the probation officer within 72 hours.

(9) The defendant must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e. anything that was designed, or

was modified for, the specific purpose of causing bodily injury or death to another person such as a nunchaku or taser).

(10) The defendant must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting permission from the court.

(11) If the probation officer determines that the defendant poses a risk to another person (including an organization), the probation officer may require defendant to notify the person about the risk and defendant must comply with that instruction. The probation officer may contact the person and confirm that the defendant has notified that person about the risk.

(12) The defendant must follow the instructions of the probation officer related to the conditions of supervision.

Special Conditions

(1) The defendant must not consume or possess alcohol.

(2) The defendant must submit to substance abuse testing to determine if the defendant has used a prohibited substance. The defendant must not attempt to obstruct or tamper with the testing methods.

37

(3)   The defendant must not knowingly enter any bar, tavern, liquor store, or other establishment where the sale and/or consumption of alcohol is the primary purpose without first obtaining the permission of the probation officer.

(4)   The defendant is restricted to his residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the probation officer. The probation officer may monitor compliance with this special condition via telephone contacts or other virtual means.

(5)   The defendant must submit his person, property, house, residence, office, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communication or data storage devices or media, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only

38

when reasonable suspicion exists that the defendant has violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

Gaddy was informed that the Court might impose each of these standard and special conditions of supervision. Dkt. No. 253. He was given the opportunity to object to them and declined to object. Dkt. No. 254.

This Order is **STAYED** for up to fourteen days for the verification of Gaddy's residence and/or establishment of a release plan, to make appropriate travel arrangements, and to ensure Gaddy's safe release. Gaddy shall be released as soon as a residence is verified, a release plan is established, appropriate travel arrangements are made, and it is safe for Gaddy to travel. There shall be no delay in ensuring travel arrangements are made. If more than fourteen days are needed to make appropriate travel arrangements and ensure Gaddy's safe release, the parties shall immediately notify the Court and show cause why the stay should be extended.

**SO ORDERED**, this 13th day of March, 2025.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA